# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

TEXAS ASSOCIATION OF BUSINESS; TEXAS CABLE ASSOCIATION,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

---

On Petition for Review from the
Federal Communications Commission

## BRIEF OF PETITIONERS

Thomas M. Johnson, Jr.
 *Counsel of Record*
Megan L. Brown
Joshua S. Turner
Kathleen E. Scott
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

*Counsel for Petitioners*

June 9, 2025

# CERTIFICATE OF INTERESTED PERSONS

25-60129; *Texas Association of Business; Texas Cable Association v. Federal Communications Commission; United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

Petitioner Texas Association of Business ("TAB"). TAB has no parent corporation. No publicly held company has any ownership interest in TAB.

Petitioner Texas Cable Association ("TCA"). TCA has no parent corporation. No publicly held company has any ownership interest in TCA.

Respondent FCC is a federal agency.

Respondent United States of America is a respondent by statute. *See* 28 U.S.C. § 2344; 47 U.S.C. § 402(a).

Counsel for Petitioners: Thomas M. Johnson, Jr.; Megan L. Brown; Joshua S. Turner; Kathleen E. Scott; Boyd Garriott.

Dated: June 9, 2025                     */s/ Thomas M. Johnson, Jr.*
                                         Thomas M. Johnson, Jr.
                                         *Counsel of Record for Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument. *See* Fifth Circuit Rule 28.2.3. The Federal Communications Commission's erroneous interpretation of the Communications Assistance for Law Enforcement Act, its disregard for the procedures mandated by that statute and the Administrative Procedure Act, and its failure to engage in reasoned decisionmaking all present important issues—the resolution of which would benefit from oral argument. *See* Fed. R. App. 34(a)(2).

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ...................................................... ii

Introduction .................................................................................................1

Jurisdictional Statement ..............................................................................4

Statement Of The Issues ..............................................................................5

Statement Of The Case .................................................................................6

    I.     Congress Enacts Statutes To Facilitate Lawful Government-Initiated Interceptions And Access. ....................................................6

          A.    Congress Enacts A Suite Of Statutes To Protect Privacy And To Authorize Lawful Interceptions.............................................6

          B.    Congress Enacts The Communications Assistance For Law Enforcement Act To Maintain Law Enforcement's Interception And Access Capabilities In The Face Of Changing Technology. ................................................................8

          C.    The FCC Promulgates Rules To Implement CALEA's Targeted Mandate To Require Policies And Procedures To Ensure Lawful Interception And Access Capabilities. .............13

          D.    Congress Subsequently Enacts Laws That Impose Privacy And Cybersecurity Requirements On Communications Providers. ................................................................................15

    II.    The FCC Extends CALEA To Impose A Universal Cybersecurity Mandate. ............................................................17

Summary Of The Argument ......................................................................20

Standard Of Review ...................................................................................26

Argument......................................................................................................27

    I.     The Commission Exceeded Its Statutory Authority Under CALEA. .27

          A.    CALEA Requires Providers To Lawfully Enable The Government-Initiated Interception And Access Capabilities Mandated By The Statute.........................................................27

          B.    The Order Misreads CALEA To Impose A General Cybersecurity Mandate Across Entire Communications Networks. ..............................................................................34

II.     The Commission Failed To Comply With Procedures Mandated By CALEA And The APA. ...................................................................53

III.    The Commission's Order Is Arbitrary And Capricious. .....................56

Conclusion ...........................................................................................................59

Certificate of Service

Certificate of Compliance

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA International v. FCC,*
  885 F.3d 687 (D.C. Cir. 2018).................................................................57

*American Council on Education v. FCC,*
  451 F.3d 226 (D.C. Cir. 2006).................................................................4

*Armstrong v. Exceptional Child Center, Inc.,*
  575 U.S. 320 (2015).................................................................................49

*AT&T, Inc. v. FCC,*
  135 F.4th 230 (5th Cir. 2025)............................................................16, 43

*Chamber of Commerce of United States v. SEC,*
  85 F.4th 760 (5th Cir. 2023).............................................................26, 58

*In re Crocker,*
  941 F.3d 206 (5th Cir. 2019)............................................................45, 46

*Dubin v. United States,*
  599 U.S. 110 (2023).................................................................................41

*Matter of Durand-Day,*
  134 F.4th 846 (5th Cir. 2025)..........................................................27, 28

*Epic Systems Corp. v. Lewis,*
  584 U.S. 497 (2018).................................................................................50

*Feliciano v. DOT,*
  145 S. Ct. 1284 (2025).............................................................................32

*Fischer v. United States,*
  603 U.S. 480 (2024).................................................................................34

*Hikvision USA, Inc. v. FCC,*
  97 F.4th 938 (D.C. Cir. 2024)....................................................26, 56, 57

*Inhance Technologies, L.L.C. v. EPA,*
  96 F.4th 888 (5th Cir. 2024).....................................................................56

*Katz v. United States,*
   389 U.S. 347 (1967)............................................................7

*Kingdomware Technologies, Inc. v. United States,*
   579 U.S. 162 (2016)..........................................................39

*Lexmark International, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014)..........................................................34

*Loper Bright Enterprises v. Raimondo,*
   603 U.S. 369 (2024)...............................................26, 33, 36

*Louisiana v. DOE,*
   90 F.4th 461 (5th Cir. 2024) ...........................................57

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)............................................................4

*Michigan v. EPA,*
   576 U.S. 743 (2015)..........................................................58

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ...........................................55

*National Association of Manufacturers v. SEC,*
   105 F.4th 802 (5th Cir. 2024) ....................................26, 56

*National Association of Private Fund Managers v. SEC,*
   103 F.4th 1097 (5th Cir. 2024) ...................................27, 35

*National Automobile Dealers Association v. FTC,*
   127 F.4th 549 (5th Cir. 2025) ....................................44, 51

*NRDC v. Wheeler,*
   955 F.3d 68 (D.C. Cir. 2020).........................................56

*Ohio Telecom Association et al. v. FCC,*
   124 F.4th 993 (6th Cir. 2025) ...........................................4

*Ohio v. EPA,*
   603 U.S. 279 (2024)...........................................25, 26, 56, 58

*Olmstead v. United States,*
   277 U.S. 438 (1928) ......................................................................6

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) ....................................................................54

*In re Serta Simmons Bedding, L.L.C.,*
   125 F.4th 555 (5th Cir. 2024) ...............................................25, 48

*Southwest Airlines Co. v. Saxon,*
   596 U.S. 450 (2022) ....................................................................38

*Students for Fair Admissions, Inc. v. President & Fellows of*
   *Harvard College,* 600 U.S. 181 (2023) ...........................................5

*Texas v. EPA,*
   132 F.4th 808 (5th Cir. 2025) ....................................................34

*United States v. Moore,*
   71 F.4th 392 (5th Cir. 2023) ......................................................34

*United States v. Palomares,*
   52 F.4th 640 (5th Cir. 2022) ......................................................36

*United States v. Taylor,*
   596 U.S. 845 (2022) ....................................................................46

*Van Buren v. United States,*
   593 U.S. 374 (2021) ....................................................................48

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ....................................................................49

*Ysleta Del Sur Pueblo v. Texas,*
   596 U.S. 685 (2022) ..............................................................30, 42

**Statutes**

5 U.S.C. § 551 ..................................................................................55

5 U.S.C. § 553 .............................................................................25, 55

5 U.S.C. § 706 .............................................................................26, 56

6 U.S.C. § 652 .................................................................................................51

18 U.S.C. § 2510 ........................................................................................37, 40

18 U.S.C. § 2511 ....................................................................................7, 30, 49

18 U.S.C. § 2513 ...............................................................................................49

18 U.S.C. § 2518 .................................................................................................7

18 U.S.C. § 2522 ...............................................................................................43

23 U.S.C. § 2344 .................................................................................................5

28 U.S.C. § 2342 .................................................................................................4

47 U.S.C. § 222 ....................................................................................40, 49, 50

47 U.S.C. § 229 .........................................12, 13, 21, 24, 30, 31, 39, 44, 45, 54, 55

47 U.S.C. § 402 .................................................................................................4

47 U.S.C. § 503 ...............................................................................................43

47 U.S.C. § 1001 ...........................................................4, 9, 10, 37, 38, 50

47 U.S.C. § 1002 ........................................9, 10, 11, 20, 24, 28, 29, 37, 41

47 U.S.C. § 1003 ...........................................................................11, 12, 47

47 U.S.C. § 1004 ........................................................12, 21, 28, 37, 38, 52

47 U.S.C. § 1005 ...........................................................................11, 24, 38, 46

47 U.S.C. § 1006 .........................11, 22, 24, 25, 31, 41, 42, 45, 53, 54, 55

47 U.S.C. § 1007 ...........................................................11, 22, 24, 43, 45

47 U.S.C. § 1008 ...........................................................................12, 24, 47

47 U.S.C. § 1009 ...........................................................................24, 47

50 U.S.C. § 1805 ...............................................................................................49

Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064............................6

Communications Assistance For Law Enforcement Act,
Pub. L. No. 103-414, 108 Stat. 4279 (1994) ............................................9, 11, 34

Electronic Communications Privacy Act of 1986,
Pub. L. No. 99-508, 100 Stat. 1848 ...................................................................8

Foreign Intelligence Surveillance Act,
Pub. L. No. 95-511, 92 Stat. 1783 (1978) .......................................................7, 8

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 .................16

Omnibus Crime Control and Safe Streets Act of 1968,
Pub. L. No. 90-351, 82 Stat. 197 .......................................................................7

Pub. L. No. 104-104, 110 Stat. 56 (1996).............................................................15

Pub. L. No. 69-632, 44 Stat. 1162 (1927)...............................................................6

Secure and Trusted Communications Networks Act of 2019,
Pub. L. No. 116-124, 134 Stat. 158 (2020) ...................................................16, 51

**Legislative Materials**

140 Cong. Rec. H10781 (daily ed. Oct. 4, 1994) ..................................22, 32, 33, 47

140 Cong. Rec. S11055 (daily ed. Aug. 9, 1994) .....................................................6

H.R. Rep. No. 99-647 (1986)...................................................................................8

H.R. Rep. No. 103-827 (1994)........................................ 9, 12, 22, 23, 29, 32, 36, 47

S. 2375, 103d Cong. 2(1994) .................................................................................52

S. Rep. No. 90-1097 (1968) ...................................................................................7

S. Rep. No. 103-402 (1994).........................................................................9, 22, 32

**Regulatory Materials**

47 C.F.R. § 1.20000 ..............................................................................................38

47 C.F.R. § 1.20007 ..............................................................................................38

47 C.F.R. § 64.2010 .........................................................................................40, 57

*Communications Assistance For Law Enforcement Act*,
First Report and Order and Further Notice of Proposed
Rulemaking, 20 FCC Rcd. 14989 (2005) .....................................................37, 38

*Communications Assistance For Law Enforcement Act*,
Notice of Proposed Rulemaking, 13 FCC Rcd. 3149 (1997).................23, 29, 37

*Communications Assistance For Law Enforcement Act*,
Order on Remand, 17 FCC Rcd. 6896 (2002) ....................................................38

*Communications Assistance For Law Enforcement Act*,
Report and Order, 14 FCC Rcd. 4151 (1999).......... 13, 14, 15, 22, 33, 44, 45, 52

Office of Commissioner Brendan Carr, Carr Statement on the Biden
FCC's Partisan, Counterproductive, and Eleventh-Hour Approach
to Salt Typhoon (rel. Jan. 15, 2025),
*available at* https://tinyurl.com/2j8cj6n5 ........................... 19, 20, 23, 29, 36, 37

*Protecting Against National Security Threats*,
Report and Order, Further Notice of Proposed Rulemaking,
and Order, 34 FCC Rcd. 11423 (2019)................................................................37

*Protecting the Nation's Communications Systems from Cybersecurity
Threats*, Declaratory Ruling and Notice of Proposed Rulemaking,
PS Docket No. 22-329, FCC 25-9 (rel. Jan. 16, 2025)........................................1

## Other Authorities

American Heritage Dictionary (3d ed. 1994) ....................................................29, 39

Comments of the FBI, CC Docket No. 97-213 (filed Dec. 12, 1997),
*available at* https://tinyurl.com/yc5j9h5d.....................................................15, 48

FCC, Statistics of Communications Common Carriers,
(1994/1995 ed.), *available at* https://tinyurl.com/yusjv9ew ..............................48

National Institute of Standards and Technology, Special Publication
800-14 (1996), *available at* https://tinyurl.com/2vu67f8n .................................40

NIST, Cybersecurity Framework 2.0 (Feb. 26, 2024),
*available at* https://tinyurl.com/2253c4zy ........................................................57

Texas Cable Association, Members,
    *available at* https://tinyurl.com/5y75f6xx ............................................................4

## INTRODUCTION

In the waning days of the prior administration, the Federal Communications Commission ("FCC" or "Commission")—on a 3-2 vote without any public notice or opportunity for comment—adopted a novel rule that imposed vague and sweeping cybersecurity mandates on the communications industry.[1]  This rule upended the Commission's prior longstanding interpretation of the relevant statute, as well as decades of congressional actions and resulting collaborative partnerships between federal agencies and the private sector that apply a flexible approach to protecting modern broadband networks as technology has evolved and threats to our communications systems have become more complex.  Indeed, Congress in 2002 established an entire sub-agency to develop a comprehensive plan to secure communications infrastructure, which ultimately led to the public-private partnership approach to cybersecurity that prevails today.

Yet in the Order under review, the FCC took the view that Congress solved cybersecurity once and for all in 1994—before the Internet was even widely available.  In the agency's telling, a single sentence in the Communications Assistance for Law Enforcement Act ("CALEA") affirmatively mandates that every

---

[1] *See Protecting the Nation's Communications Systems from Cybersecurity Threats*, Declaratory Ruling and Notice of Proposed Rulemaking, PS Docket No. 22-329, FCC 25-9 (rel. Jan. 16, 2025) ("Order").  The administrative record is parallel cited as AR[certified index number]:[document pages].

telecommunications carrier in the country "ensure" that none of its communications are ever compromised. While the agency did not specify precisely what steps would satisfy this new obligation, it provided a non-exhaustive list of security measures that it believed were necessary, but not necessarily sufficient, to comply with CALEA.

That is not the law. A proper reading of CALEA's statutory text, structure, and purpose shows that Congress did not obliquely impose a universal cybersecurity mandate over 30 years ago. Rather, in enacting the Communications *Assistance for Law Enforcement* Act, Congress's focus was—as the statute's name indicates— providing communications assistance for law enforcement. Congress aimed to ensure that the development of then-new digital technologies did not disrupt law enforcement's ability to continue lawfully intercepting communications. It did so by requiring carriers to maintain certain "capabilities" in their networks that facilitate law enforcement's lawful interception of communications and access to call-identifying information. The statute's accompanying systems security and integrity provision (Section 105) supports this goal and is limited to ensuring that those newly mandated capabilities supporting law enforcement are applied lawfully and accountably. Section 105 does not establish an affirmative obligation to prevent any and all third-party hacking attempts. The Order's contrary conclusion wreaks

havoc on the statutory text and pushes the agency far beyond the scope of its lawful authority.

But that is not all. In its haste to issue the Order before the agency assumed new leadership, and over the dissent of two Commissioners, the FCC cut procedural corners. It failed to abide by CALEA's procedures for issuing technical requirements and standards, and it inexplicably bypassed the Administrative Procedure Act's ("APA") notice-and-comment requirements. Worse still, the Order's perfunctory analysis and its inclusion of a non-exhaustive list of specific operational requirements are hopelessly arbitrary and capricious.

Petitioners take cybersecurity seriously and invest substantial amounts in protecting their networks from outside interference and foreign and domestic threats. They can do so with confidence because of the prevailing legal landscape that encourages innovation and investment in new technologies in partnership with the federal government. The FCC's sweeping, vague, and prescriptive Order runs counter to that longstanding and successful approach and will introduce uncertainty and increase costs that impede the shared goals of protecting America's networks from harm. This Court should find the Order unlawful and vacate it.

# JURISDICTIONAL STATEMENT

This Court has jurisdiction to review final orders of the FCC. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). The Commission issued the final Order under review on January 16, 2025. Petitioners timely petitioned for review on March 17, 2025.

Petitioners have standing because their members include "telecommunications carriers," as that term is defined in CALEA and the Order, *see* 47 U.S.C. § 1001(8); Order ¶ 14, AR1:9-10,[2] that are injured by the FCC's failure to provide them with statutorily required notice and opportunity to comment, and decision to unlawfully impose new, costly, and uncertain cybersecurity requirements, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) (where "plaintiff is himself an object of the action … there is ordinarily little question that the action … has caused him injury"). Specifically, the Order makes clear that carriers have an "independent[] obligat[ion]," [e]ven absent rules adopted by the Commission," to adopt a non-exhaustive list of "basic cybersecurity hygiene

---

[2] The scope of covered "telecommunications carriers" in CALEA has been interpreted more broadly than in Title II of the Communications Act of 1934 ("Communications Act"), to include traditional telephone service, certain forms of voice over Internet protocol ("VoIP"), and broadband Internet access service. *See Am. Council on Educ. v. FCC*, 451 F.3d 226, 232 (D.C. Cir. 2006); *see also, e.g.*, Texas Cable Association, Members (listing examples of covered carriers), *available at* https://tinyurl.com/5y75f6xx. As the Sixth Circuit has ruled, the FCC lacks authority to classify broadband Internet access service providers as telecommunications carriers under Title II. *See Ohio Telecom Association et al. v. FCC*, 124 F.4th 993 (6th Cir. 2025).

practices" and otherwise "employ best practices" that are left unspecified. Order ¶¶ 13-14, AR1:9-10. Petitioners seek to remedy their injuries to further their broader institutional purposes in a manner that does not require the participation of individual members. *See* D.E. 2, Pet. for Review at 2-3. They thus have associational standing, *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023), and are each a "party aggrieved by the final order." 23 U.S.C. § 2344.

## STATEMENT OF THE ISSUES

1. Whether the Commission erred in interpreting CALEA to impose a mandate on covered communications providers to protect their networks from all third-party cybersecurity threats.

2. Whether the Commission violated the procedures mandated by CALEA and the APA by issuing the Order without notice and comment or consideration of the factors required by statute.

3. Whether the Commission engaged in arbitrary and capricious decisionmaking in issuing the Order.

# STATEMENT OF THE CASE

**I.** **CONGRESS ENACTS STATUTES TO FACILITATE LAWFUL GOVERNMENT-INITIATED INTERCEPTIONS AND ACCESS.**

    **A.** **Congress Enacts A Suite Of Statutes To Protect Privacy And To Authorize Lawful Interceptions.**

Long ago, telephone conversations were not private. In 1928, 50 years after "the invention of the telephone," the Supreme Court held that conversations over "intervening wires" outside an individual's "house or office" were not protected by the Fourth Amendment. *Olmstead v. United States*, 277 U.S. 438, 465 (1928). The result was that "the local sheriff could drive down the road, climb on the top of his car, plug a couple alligator clips on to a telephone wire, put on the earphones and" simply "listen in" on private conversations. 140 Cong. Rec. S11055 (daily ed. Aug. 9, 1994) (statement of Sen. Patrick Leahy).

Congress rejected that status quo. In Section 605 of the Communications Act, Congress made it unlawful for a "person" not "authorized by the sender" to "intercept any communication." Pub. L. No. 73-416, § 605, 48 Stat. 1064, 1103-04 (codified, as amended, at 47 U.S.C. § 605). The same provision also prohibited communications providers from "divulg[ing] or publish[ing]" communications they received and transmitted absent "a subpoena issued by a court or competent jurisdiction, or on demand of other lawful authority." *Ibid.*; *see also* Pub. L. No. 69-632, § 27, 44 Stat. 1162, 1172 (1927) (similar provision in the predecessor Radio Act). The Supreme Court later reversed its earlier decision to exempt telephone calls

from constitutional protection. In 1967, it held that "electronically listening to and recording [one]'s words" is "a 'search and seizure' within the meaning of the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 353 (1967).

Congress clarified the state of surveillance law in light of *Katz* and prior opinions construing Section 605 of the Communications Act. *See* S. Rep. No. 90-1097, at 66-69 (1968). The result was the Wiretap Act. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Tit. III, 82 Stat. 197, 211-25 (1968). In it, Congress "define[d] on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized" and "prohibit[ed] any unauthorized interception of such communications, and the use of the contents thereof in evidence in courts and administrative proceedings." *Id.* § 801(b); *accord* 18 U.S.C. § 2511. It also entitled providers "furnishing such facilities or technical assistance [to] be compensated therefor … for reasonable expenses incurred in providing such facilities or assistance." 18 U.S.C. § 2518(4).

The Wiretap Act also addressed the risk of foreign surveillance. It reserved to the President the authority to "protect national security information against foreign intelligence activities." Congress later repealed that provision and replaced it with a comprehensive scheme in the Foreign Intelligence Surveillance Act. *See* Pub. L. No. 95-511, 92 Stat. 1783 (1978) ("FISA"). FISA gave federal officials

authority to "determine the existence and capability of electronic surveillance equipment being used by persons not authorized to conduct electronic surveillance" so that they could enforce the Wiretap Act's prohibitions and "protect information from unauthorized surveillance." *Id.* § 105(f)(2) (codified at 50 U.S.C. § 1805(g)(2)).

The Wiretap Act's protections, while substantial, became outdated. In 1986, with the statute "not twenty years old," Congress recognized that its protections for traditional wire communications by common carriers had been overtaken by "technological" changes. H.R. Rep. No. 99-647, at 17 (1986). New means of communication had arisen, such as "electronic mail," "cellular and cordless telephones," and "a dazzling array of digitized information networks." *Id.* at 18. Congress responded with the Electronic Communications Privacy Act of 1986 ("ECPA"), *see* Pub. L. No. 99-508, 100 Stat. 1848, in order to "amend[] the Wiretap Act to include new technologies," H.R. Rep. No. 99-647, at 27; *see also* ECPA § 101, and to expand the Wiretap Act's privacy protections, *see id.* §§ 102-103.

### B. Congress Enacts The Communications Assistance For Law Enforcement Act To Maintain Law Enforcement's Interception And Access Capabilities In The Face Of Changing Technology.

While the Wiretap Act required providers to comply with lawful intercept requests and entitled them to compensation for supporting such requests, "the rapid proliferation of new telecommunications technologies and services ha[d] vastly

complicated law enforcement's task in that regard." H.R. Rep. No. 103-827, at 14 (1994). Congress thus needed to act to "preserve the government's ability, pursuant to court order, to intercept communications that utilize advanced technologies such as digital or wireless transmission." *Id.* at 16; *see also* S. Rep. No. 103-402, at 13-16 (1994) (similar).

In 1994, Congress responded with the statute at issue in this case: CALEA. *See* Pub. L. No. 103-414, 108 Stat. 4279 (1994). The statute's preamble explains its intent "to make clear a telecommunications carrier's duty to cooperate in the interception of communications for law enforcement purposes, and for other purposes." *Id.* Preamble.

Section 103 of CALEA, entitled "Assistance Capability Requirements," imposed its core substantive requirement. *See* 47 U.S.C. § 1002. Section 103 provides that "a telecommunications carrier[3] shall ensure that its equipment, facilities, or services that provide a customer or subscriber with the ability to originate, terminate, or direct communications are capable of" four discrete actions: (1) interception, (2) access, (3) delivery, and (4) facilitation. *Id.* § 1002(a). *First*, providers must be able to "***intercept***" "all wire and electronic communications" on

---

[3] A "telecommunications carrier" is defined to include not only traditional common carriers but certain other entities "engaged in providing wire or electronic communication switching or transmission service." *See* 47 U.S.C. § 1001(8). Petitioners thus use the broader term "providers" throughout this brief.

their network "pursuant to a court order or other lawful authorization." *Id.*
§ 1002(a)(1) (emphasis added). *Second*, providers must be able to "***access*** call-identifying information that is reasonably available to the carrier" "pursuant to a court order or other lawful authorization." *Id.* § 1002(a)(2) (emphasis added).
*Third*, providers must be able to "***deliver[]*** intercepted communications and call-identifying information to the government." *Id.* § 1002(a)(3) (emphasis added).
*Fourth*, providers must "***facilitat[e]*** authorized communications interceptions and access" "unobtrusively and with a minimum of interference with any subscriber's telecommunications service and in a manner that protects" both customer privacy and the secrecy of the government's interception or access. *Id.* § 1002(a)(4) (emphasis added). These capabilities all center around access for the "government," defined to include both the federal government and the States. *Id.* § 1001(5).

Section 103 also imposes three important limits on its capability mandates.
*First*, CALEA "does not authorize any law enforcement agency or officer" to either "require any specific design of equipment, facilities, services, features, or system configurations" or "to prohibit the adoption of any equipment, facility, service, or feature." *Id.* § 1002(b)(1). *Second*, the capability requirements "do not apply to" information services (as that term is defined in CALEA), private networks, and interconnection services and facilities. *Id.* § 1002(b)(2). *Third*, CALEA does not make a provider "responsible for decrypting, or ensuring the government's ability to

decrypt, any communication encrypted by a subscriber or customer, unless the encryption was provided by the carrier and the carrier possesses the information necessary to decrypt the communication." *Id.* § 1002(b)(3).

The rest of CALEA focuses on the lawful implementation of Section 103's capability requirements. Section 104 allows the Attorney General to set the "capacity" of intercepts and access requests providers must be able to accommodate. *See id.* § 1003. Section 106 requires cooperation with (and by) manufacturers of a provider's equipment in order to comply with Section 103's capability requirements and Section 104's capacity requirements. *See id.* § 1005. Section 107 authorizes private standards bodies to create "technical requirements and standards" as a safe harbor for compliance with Section 103's capability requirements. *See id.* § 1006(a). It further gives the Commission authority to (1) set its own "technical requirements or standards" only when private standards are absent or deemed "deficient" in a rulemaking and (2) extend the deadline to comply with Section 103's capability requirements for certain facilities. *See id.* § 1006(b)-(c). Section 108 limits judicial enforcement of orders for providers to comply with CALEA to situations where alternative means of obtaining an intercept "are not reasonably available to law enforcement." *Id.* § 1007; *see also* CALEA § 201 (codified at 18 U.S.C. § 2522). And Section 109 authorizes reimbursement for providers to comply with Section

103's capability requirements and Section 104's capacity requirements.  *See* 47 U.S.C. § 1008; *see also id.* §§ 1003(e), 229(e).

Section 105—relied on by the Commission in the Order—is also specifically tied to implementation of Section 103's capability requirements.  While it was "increasingly" difficult to "intercept[]" communications prior to CALEA's enactment, H.R. Rep. No. 103-827, at 15, Section 103 changed that by requiring providers to remain capable of facilitating government-initiated interception and access.  Ensuring government access to those capabilities created concerns about lawfulness and accountability, and Section 105 addresses them.  It instructs that providers may not "activat[e]" "any interception of communications or access to call-identifying information"—i.e., the capabilities mandated by Section 103—without both (1) "a court order or other lawful authorization," and (2) "the affirmative intervention of an individual officer or employee."  47 U.S.C. § 1004.

CALEA's addition of Section 229 to the Communications Act reinforces Section 105's targeted focus on law enforcement interceptions and access.  Section 229 authorizes the Commission to adopt rules to "implement the requirements of" CALEA, 47 U.S.C. § 229(a), which specifically "shall include rules to implement section 105 … that require common carriers" to (1) "establish appropriate policies and procedures for the supervision and control of its officers and employees" engaged in interception and access, (2) "maintain secure and accurate records of any

interception or access," and (3) "submit to the Commission the policies and procedures adopted to comply with the [previous two] requirements." *Id.* § 229(b).

### C. The FCC Promulgates Rules To Implement CALEA's Targeted Mandate To Require Policies And Procedures To Ensure Lawful Interception And Access Capabilities.

In 1999, following a round of notice and comment, the Commission issued an Order to "establish the systems security and integrity regulations that telecommunications carriers must follow to comply with section 105 of CALEA." *CALEA*, Report and Order, 14 FCC Rcd. 4151, ¶ 1 (1999) ("1999 CALEA Order").

The Commission expressly recognized the link between Section 103's government-initiated capability requirements and Section 105's security-and-integrity requirement. It explained that CALEA "was intended to preserve the ability of law enforcement officials to conduct electronic surveillance effectively and efficiently in the face of rapid advances in telecommunications technology." *Id.* ¶ 3. But "[i]n enacting this statute," the Commission explained, "Congress recognized the need to protect privacy interests *within the context of court-authorized electronic surveillance*." *Ibid.* (emphasis added). In particular, the FCC concluded that "section 105 of the Act was enacted to 'make clear that government agencies do not have the authority to activate remotely interceptions within the switching premises of a telecommunications carrier.'" *Id.* ¶ 17 (quotations omitted). To ensure as much, the Commission explained, section 105 calls for "policies and

procedures … that require the affirmative intervention and knowledge of [providers'] employees of any interception being effected through their switching premises, and that such interception is done lawfully and carefully documented." *Ibid.*

The Commission's rules reflected Section 105's targeted focus on government-initiated surveillance. The agency recognized that "section 105 of CALEA [and] sections 229(b) [and] (c) of the Communications Act" did not give the "Commission[] responsibility to 'micro-manage' telecommunications carriers' corporate policies." 1999 CALEA Order ¶ 18.

The FCC thus closely tracked the personnel management and recordkeeping regulations mandated by Section 229. *First*, consistent with Section 229(b)(1), the Commission required providers to adopt "policies and procedures to ensure the supervision and control of its officers and employees" engaged in interceptions and to "report to the affected law enforcement agencies" unauthorized interceptions. *Id.* Appendix A (codified at 47 C.F.R. § 1.20003); *see also id.* ¶¶ 21-38. *Second*, consistent with Section 229(b)(2), the Commission instructed providers to maintain secure and accurate records of "each interception of communications or access to call-identifying information," including "the identity of the law enforcement officer presenting the authorization." *Id.* Appendix A (codified at 47 C.F.R. § 1.20004); *see also id.* ¶¶ 39-51. *Third*, consistent with Section 229(b)(3) and Section 229(c), the

Commission required providers to "file with the Commission the policies and procedures it uses to comply with the [previous two] requirements." *Id.* Appendix A (codified at 47 C.F.R. § 1.20005); *see also id.* ¶¶ 52-57.

The Commission also found that it lacked "an explicit statutory mandate" to "expand the criminal and/or civil liability of a carrier" beyond its Section 229 implementing rules. *Id.* ¶ 59. It credited this understanding of CALEA to many commenters, *id.* ¶ 59 n.207, including a comment from the Federal Bureau of Investigation ("FBI") finding that "Section 105 of CALEA does not place any additional liability on carriers that does not already exist under common law or the provisions of applicable statutes (e.g., Title 18 of the United States Code)." Comments of the FBI, CC Docket No. 97-213, at 17 (filed Dec. 12, 1997) ("1997 FBI Comments"), *available at* https://tinyurl.com/yc5j9h5d. Thus, based on "the plain language of the statute," the FCC "decline[d] to adopt any additional rules that extend criminal and/or civil liability … to a carrier for the violations of section 105 of CALEA and section 229 of the Communications Act" beyond the penalties for "violat[ing] the Commission's rules implementing section 105 of CALEA." 1999 CALEA Order ¶ 60.

### D. Congress Subsequently Enacts Laws That Impose Privacy And Cybersecurity Requirements On Communications Providers.

Just two years after CALEA's enactment, Congress added a new Section 222 to the Communications Act, entitled "Privacy of Customer Information." *See* Pub.

L. No. 104-104, § 702, 110 Stat. 56, 148 (1996) (codified at 47 U.S.C. § 222). "Under section 222, telecommunications carriers" have a duty to "protect the confidentiality of 'customer proprietary network information,'" which is a defined term that refers to certain information "made available to the carrier by the customer solely by virtue of the carrier-customer relationship." *AT&T, Inc. v. FCC*, 135 F.4th 230, 232 (5th Cir. 2025) (quotations omitted).

Other subsequent statutes also sought to improve aspects of communications privacy and security. In the Homeland Security Act of 2002, Congress created a new sub-agency within DHS and tasked it with "develop[ing] a comprehensive national plan for securing the … critical infrastructure of the United States, including … information technology and communications systems (including satellites)." Pub. L. No. 107-296, § 201(d)(5), 116 Stat. 2135, 2146 (codified at 6 U.S.C. § 652(e)(1)(E)). This sub-agency, initially called the National Protection and Programs Directorate ("NPPD") and later renamed the Cybersecurity and Infrastructure Security Agency ("CISA"), was expanded to focus on additional cyber functions by the Cybersecurity and Infrastructure Security Agency Act of 2018. More recently, in the Secure and Trusted Communications Networks Act of 2019, Congress prohibited subsidies for communications equipment that poses national security risks and reimbursed providers for replacing such equipment. *See generally* Pub. L. No. 116-124, 134 Stat. 158 (2020).

## II.   THE FCC EXTENDS CALEA TO IMPOSE A UNIVERSAL CYBERSECURITY MANDATE.

On January 16, 2025, the Commission issued the Order, AR 1:1.  On a 3-2 vote and without notice or an opportunity for comment, the Order "conclude[s] that section 105 of CALEA affirmatively requires telecommunications carriers, as defined by CALEA, to secure their networks from unlawful access to or interception of communications."  Order ¶ 11, AR1:8.  Through this approach, the Commission rejected the longstanding view that Section 105's security-and-integrity requirement applied only to Section 103's government-initiated capability requirements.  The FCC instead contended that providers must "take action to prevent *all* unauthorized interception and access to call-identifying information within their networks, *whether by law enforcement or by other parties*."  *Id.* ¶ 13, AR1:9 (emphasis added).  In other words, the Commission declared—for the first time and more than 25 years since its initial interpretation of CALEA—that Section 105 imposes a general cybersecurity mandate, under which providers can apparently be held strictly liable for failure to prevent "all" unauthorized interceptions.

Under the Commission's expansive reading of CALEA, it claims that, "[e]ven absent rules adopted by the Commission," providers must "adopt[] certain basic cybersecurity practices for their communications systems and services" to "satisfy their statutory obligations under section 105."  Order ¶ 14, AR1:9-10.  As "example[s]" of these newly mandated requirements, it lists "role-based access

controls, changing default passwords, requiring minimum password strength, and adopting multifactor authentication." *Ibid.* It also purports to require "patch[es]" for "known vulnerabilities" and "best practices that are known to be necessary in response to identified exploits." *Ibid.*

The Commission also concludes it has authority under Section 229 to "adopt rules that require telecommunications carriers to take specific steps to secure their networks against unauthorized interception." Order ¶ 15, AR1:10. The agency issued a notice of proposed rulemaking to promulgate such additional security requirements. *See* Order ¶¶ 16-63, AR1:10-39. For example, the Order used its new interpretation as the basis to seek comment on reams of new potential cybersecurity mandates—on topics ranging from risk management plans to encryption to security updates to audits—and to propose extending these requirements beyond carriers to broadcasters, cable companies, satellite operators, and more. Order ¶¶ 16-34, AR1:10-24.

It is hard to overstate the breadth of the Commission's newly claimed authority. Cybersecurity and privacy are difficult and complicated policy issues. They are informed by an army of private-sector engineers and standards bodies, centuries-old constitutional protections, an array of federal statutes with roots dating back to the 1930s and enacted as recently as the 2020s, and federal officials across sectoral agencies, CISA, the National Institute for Standards and Technology

("NIST"), and more. Yet the Order ignores this complexity and arrogates to itself plenary, comprehensive authority in this area, requiring that every communications provider in the country must "ensure" absolute protection of their entire network against any and all external cyber threats. And the Order bases this declaration, which departs substantially from longstanding Commission interpretation, not on cybersecurity legislation, but rather on a single sentence in a decades-old statute enacted more than 30 years ago to solve a narrow law enforcement problem, before the Internet was widely available.

In defense of its titanic statutory interpretation change, the Commission offers only two paragraphs of perfunctory statutory analysis. Order ¶¶ 12-13, AR1:8-9. It claims that because Section 105 of CALEA uses the phrase "any interception" "without limitation," it is "not limited to particular forms of interception or access." *Id.* ¶ 13, AR1:9 (cleaned). And it states that Congress's decision to not adopt a purportedly narrower version of Section 105 in an earlier bill shows that Section 105 must have a broad scope. *Ibid.*

Then-Commissioner Carr independently issued a dissent.[4] He explained that the agency lacked "the authority to adopt" its Order. *Id.* at 1. In particular, the Order

---

[4] *See* Office of Commissioner Brendan Carr, Carr Statement on the Biden FCC's Partisan, Counterproductive, and Eleventh-Hour Approach to Salt Typhoon (rel. Jan. 15, 2025) ("Carr Dissent"), *available at* https://tinyurl.com/2j8cj6n5. Because the agency "br[oke] from Commission precedent and [did] not follow the FCC's normal

purported to "impos[e] an affirmative obligation … to take certain undefined cybersecurity actions across every portion of the network" even though Section 105 by its plain terms applies "within the 'switching premises'—but *only* within the switching premises—to enable authorized intercepts by U.S. law enforcement." *Ibid.* Commissioner Simington also dissented.

## SUMMARY OF THE ARGUMENT

The Commission's Order must be vacated for three reasons. *First*, the Order's assertion of a universal cybersecurity mandate fundamentally misinterprets and unlawfully expands Section 105 of CALEA. *Second*, the Order was promulgated without following the procedures mandated by both CALEA and the APA. *Third*, the Order is arbitrary and capricious.

**I.** The Commission misinterprets Section 105 of CALEA to impose a universal cybersecurity mandate across every provider's entire network, rather than as a narrow provision focused on lawful government-initiated intercepts.

**A.** Starting with the text, Section 103 is the heart of the statute. It mandates communications assistance *for law enforcement* by requiring that providers be "capable of" performing "intercept[s]" and "access" for law enforcement "*pursuant to a court order or other lawful authorization*." 47 U.S.C. § 1002(a) (emphasis

---

procedures for processing dissenting statements," he issued his dissent on his *X* account a day before the Order was publicly released. *See id.* at 1.

added).  Section 105 follows and mirrors this language.  It states that providers must "ensure" that "any interception … or access"—i.e., the capabilities mandated by Section 103—"effected within its switching premises can be activated only in accordance with a court order or other lawful authorization and with the affirmative intervention of an" employee.  *Id.* § 1004.  The relationship between these two provisions is obvious from the text:  Section 103 mandates interception and access capabilities for law enforcement, and Section 105 requires a provider to ensure it lawfully effectuates those mandatory capabilities.

Other elements of Section 105's text confirm this straightforward interpretation.  The provision is limited to interceptions and access "within [the provider's] switching premises"—exactly where a provider would maintain Section 103's mandatory interception and access capabilities.  *Id.*  Section 105 also does not regulate interceptions and access in the abstract but rather regulates the process through which they are "activated."  The word "activate" presupposes a capability to intercept and access in the first place, exactly as Section 103 requires.

The structure aligns with other CALEA provisions.  To "implement section 105," Congress instructed the Commission to require narrow personnel and recordkeeping requirements, 47 U.S.C. § 229(b), to ensure a provider lawfully implements its own government-initiated interception and access capabilities.  Section 107's safe harbor for Section 103's capability requirements mandates

technical standards and requirements to "protect the privacy and security of communications," 47 U.S.C. § 1006(b)(2), which makes sense only if Section 105's security-and-integrity requirements are targeted at effectuating rather than supplementing Section 103. Section 108 authorizes a court to enforce CALEA only if it determines that no other means are "reasonably available *to law enforcement*" to effectuate an interception, 47 U.S.C. § 1007(a)(1) (emphasis added)—a limitation that would make no sense if Congress intended to enact a general cybersecurity mandate.

CALEA's purpose mirrors this text and structure. Its legislative history unambiguously states Congress understood that Section 105 "protect[] systems security and integrity" by "mak[ing] clear that *government agencies* do not have the authority to activate remotely interceptions within the switching premises of a telecommunications carrier," H.R. Rep. No. 103-827, at 26 (emphasis added); *see also* S. Rep. No. 103-402, at 25-26 (same), and by imposing "tougher standards *for the FBI and the police* in going through any kind of wiretapping." 140 Cong. Rec. H10782 (daily ed. Oct. 4, 1994) (statement of Rep. Don Edwards) (emphasis added). The FCC agreed. Its 1999 implementing order imposed only narrow procedural requirements with the understanding that Section 105 was designed "to protect privacy interests *within the context of court-authorized electronic surveillance*." 1999 CALEA Order ¶ 3 (emphasis added). And these contemporaneous

understandings were perfectly consistent with CALEA's focused aim: providing communications assistance for law enforcement.

**B.** The Commission errs because it eschews this text, structure, and history in favor of a reading that takes a few isolated clauses out of context.

Starting with the text, the Commission says that Section 105 requires the prevention of "*any* interception" "without limitation." Order ¶ 13, AR1:9. But that ignores the limitations on the face of the text. It overlooks that Section 105 regulates not "interceptions" but the *activation* of lawful interceptions—a term that only makes sense when read in tandem with Section 103. And it fails to account for the fact that Section 105 reaches only interceptions activated "within [the] switching premises"—a term long understood to mean a provider's "central offices and mobile telephone switching offices." H.R. Rep. No. 103-827, at 26; *see also CALEA*, Notice of Proposed Rulemaking, 13 FCC Rcd. 3149, ¶ 21 n.82 (1997) (same) ("1997 CALEA NPRM"). While the Commission suggests that Congress meant for "switching premises" to reach facilities across a provider's entire network, Order ¶ 13 n.45, AR1:9, it does so based on a misreading of its own precedent. *See infra* pp.38 (collecting authorities). And, in any event, that interpretation conflicts with the plain meaning of "switching premises" and would effectively read it "out of the statute." Carr Dissent at 1.

The Commission's reading also creates a slew of structural issues.  It would arrogate to the Commission broad authority to declare technical requirements and standards that CALEA expressly reserves for "industry association[s]" and "standard-setting organization[s]" to promulgate in the first instance.  47 U.S.C. § 1006(a)(2).  It would negate CALEA's instruction that the government may not require providers to "adopt[]" specific system "design[s]."  *Id.* § 1002(b)(1)(A).  It would create an absurdity by imposing a burdensome, universal cybersecurity mandate without a statutory enforcement mechanism—all in a statute enacted before most Americans had even heard of the Internet.  *See id.* §§ 1007(a)(1) (limiting statutory enforcement to facilitate interceptions for "law enforcement"), 229(d) (limiting FCC enforcement to implementing regulations and not the underlying statute).  And such a broad cybersecurity requirement would create strange results: manufacturers would need to be "consult[ed]" and to "cooperate" to help providers comply with CALEA's capability and capacity requirements but not with complex cybersecurity safeguards, *id.* § 1005, and Congress would have appropriated half-a-billion dollars for CALEA compliance efforts without allocating any of that money to the onerous cybersecurity mandate, *id.* §§ 1008(a), (b)(2), 1009.

The Order also flouts the legislative context and purpose.  For one, the Commission's reading of CALEA would mean that Congress required providers to proactively secure all of the communications network equipment that existed when

CALEA was adopted in 1994, totaling millions of miles of above-ground physical infrastructure, yet there is no mention of this gargantuan undertaking in the legislative history. And that drastic action would be in stark contrast to decades of privacy and cybersecurity efforts both before and after CALEA's enactment. "Congress does not" typically "hide" such "elephants" in "mouseholes." *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 590 (5th Cir. 2024). Finally, the Commission's resort to a single, unexplained amendment to CALEA during the drafting process both misreads that amendment and directly contravenes CALEA's obvious purpose.

**II.** The Order's interpretive errors were made possible at least in part by the Commission's procedural errors. In particular, the agency failed to abide by Section 107(b) of CALEA because the Order issues requirements designed to "protect the privacy and security of communications not authorized to be intercepted," 47 U.S.C. § 1006(b)(2), without the required "petition" and finding of "deficien[cy]," *id.* § 1006(b), and without considering costs and compliance burdens, *id.* § 1006(b)(3)-(5). The Order was also issued without notice and comment, in violation of the APA. *See* 5 U.S.C. § 553.

**III.** Finally, the Order flunks the APA's basic requirement that an agency's decisionmaking be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). *First*, the agency's vague declaration that providers must "ensure"

security "fails to provide comprehensible guidance about what falls within the bounds" of its regulations. *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 950 (D.C. Cir. 2024). *Second*, the agency's handful of "example" security measures are conjured from non-binding government recommendations, and the FCC fails to explain why it chose those measures and not others. *Third*, the agency entirely "failed to consider … the costs and benefits associated with the regulation." *Chamber of Com. of United States v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (cleaned).

For each of these reasons, the Court should vacate the Order. *See Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815 (5th Cir. 2024) ("vacatur of an agency action is the default rule in this Circuit" when "an agency rule violates the APA").

## STANDARD OF REVIEW

Under the APA, "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "in excess of statutory jurisdiction," "without observance of procedure required by law," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Interpretive questions are reviewed *de novo* to ascertain the statute's "single, best meaning … fixed … at the time of enactment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). An agency's decisionmaking "qualifies as arbitrary or capricious if it is not reasonable or reasonably explained." *Ohio*, 603 U.S. at 292 (cleaned).

**I.    THE COMMISSION EXCEEDED ITS STATUTORY AUTHORITY UNDER CALEA.**

**A.    CALEA Requires Providers To Lawfully Enable The Government-Initiated Interception And Access Capabilities Mandated By The Statute.**

Before assessing the Commission's errors in the Order, Petitioners first explain the proper reading of the statutory text, structure, context, and purpose that has long been espoused by the Commission.

1. <u>Text.</u>  "When interpreting acts of Congress," this Court "always begin[s] with the statutory text." *Matter of Durand-Day*, 134 F.4th 846, 851 (5th Cir. 2025). And "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1111 (5th Cir. 2024).

*a. Sections 103 and 105.*  The textual heart of CALEA is Section 103's capability requirements.  Those command providers to be "capable of" (1) "expeditiously isolating and enabling the government, *pursuant to a court order or other lawful authorization, to intercept*, to the exclusion of any other communications, *all wire and electronic communications*," and (2) "expeditiously isolating and enabling the government, *pursuant to a court order or other lawful*

*authorization, to access call-identifying information*." 47 U.S.C. § 1002(a)(1), (2) (emphases added).

Section 105's one sentence of text follows and closely mirrors Section 103's requirement for lawful government-initiated interception and access. It reads:

> A telecommunications carrier shall ensure that *any interception of communications or access to call-identifying information* effected within its switching premises can be activated *only in accordance with a court order or other lawful authorization* and with the affirmative intervention of an individual officer or employee of the carrier acting in accordance with regulations prescribed by the Commission.

*Id.* § 1004 (emphases added).

The relationship between the two sections is obvious. Section 103 requires that a provider be "capable of" enabling government "intercept[ion]" and "access" "pursuant to a court order or other lawful authorization," *id.* § 1002(a), and Section 105 places a corresponding obligation on providers to ensure that "any interception … or access" it "activate[s]" for law enforcement is "in accordance with a court order or other lawful authorization," *id.* § 1004. By using the same language in Sections 103 and 105, CALEA makes clear that Section 105 requires providers to lawfully effectuate the government-initiated interception and access capabilities mandated by Section 103. *See Durand-Day*, 134 F.4th at 852 ("statutes should not be read as a series of unrelated and isolated provisions, as language cannot be interpreted apart from context" (cleaned)).

*b. "Switching Premises."* Other elements of Section 105's text confirm that understanding. Consider the clause "within [the provider's] switching premises." The ordinary meaning of "switching premises" was understood in 1994 to mean a provider's "central offices and mobile telephone switching offices." H.R. Rep. No. 103-827, at 26; *see also* 1997 CALEA NPRM ¶ 21 n.82 (same). These offices are the exact location where providers would be expected to implement Section 103's government-initiated interception and access capabilities. Congress's choice to limit Section 105 to those offices—and not to facilities across a provider's entire network—effects Section 103's limitation to government-initiated interception and access. *See* Carr Dissent at 1 ("CALEA's 'switching premises' language is key to the statute's operation").

*c. "Can be activated."* The clause "can be activated" provides further support for this conclusion. To "activate" means "to make active." *Activate*, American Heritage Dictionary (3d ed. 1994). Congress's choice to make *activation* of "interception … or access" the trigger for Section 105 shows that it presupposed a capability that could be made active to effect an intercept or access. Section 103 supplies that capability. It requires capabilities for providers to "enabl[e] the government" to "intercept" and "access." 47 U.S.C. § 1002(a)(1), (2). Thus, Section 105's use of "activate" confirms its limitation to the government-initiated intercepts and access that must be "enabled" under Section 103.

29

The uniqueness of Section 105's syntax reinforces this conclusion. The Wiretap Act—which CALEA both amends and cross-references—does not make it illegal to "activate" an interception but instead makes it illegal to "intercept[]," 18 U.S.C. § 2511(1)(a), or to "use[] … any electronic, mechanical, or other device to intercept," *id.* § 2511(b). "[D]ifferences in language like this convey differences in meaning." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022). Here, the difference shows that Section 105 does not regulate interceptions and access in the abstract—as Congress does in the Wiretap Act. Section 105 instead regulates the means to lawfully "activate" the specific law enforcement interception and access capabilities required by Section 103.

2. <u>Structure.</u> CALEA's structure confirms this straightforward understanding of the statutory text.

*a. Section 229.* Section 229 instructed the Commission, when promulgating rules "necessary to implement the requirements of [CALEA]," 47 U.S.C. § 229(a), to "include rules to implement section 105" with specific "require[ments]," *id.* § 229(b). Those requirements fall into two procedural buckets: (1) *personnel* requirements, i.e., "establish[ing] appropriate policies and procedures for the supervision and control of its officers and employees (A) to require appropriate authorization to activate interception of communications or access to call-identifying information; and (B) to prevent any such interception or access without such

authorization," and (2) *recordkeeping* requirements, i.e., "maintain[ing] secure and accurate records of any interception or access with or without such authorization." *Id.* § 229(b)(1), (2).

Section 229's targeted personnel and recordkeeping requirements further emphasizes Section 105's incidental relationship to Section 103. Section 229's requirements are internal, process-oriented, and focused on "appropriate authorization" to "*activate* interception … or access." *Id.* § 229(b)(1)(A) (emphasis added). Thus, just like Section 105 itself, the regulations to implement Section 105 contemplate only government-initiated interception and access capabilities mandated by Section 103.

*b. Privacy And Security Safe Harbor.* Section 107 is in accord. That provision allows providers to satisfy Section 103's capability requirements through a safe harbor if they comply "with publicly available technical requirements or standards adopted … by the Commission." *Id.* § 1006(a)(2). The Commission is empowered in certain circumstances to issue "technical requirements or standards" for the safe harbor that, *inter alia*, "protect the privacy and security of communications not authorized to be intercepted." *Id.* § 1006(b)(2). But these privacy and security standards can only be used to "meet the requirements of section [103]," *id.* § 1006(a)(2), not section 105, thus confirming that Congress's concerns about technical security and privacy relate to Section 103's capability requirements. If

Congress had intended Section 105 to independently obligate providers to adopt technical security standards, it stands to reason that the Section 107 safe harbor would account for that provision as well.

3. <u>Purpose And Context.</u>  The contemporaneous understanding of Section 105 and the broader purpose of CALEA align with the plain text and structure of the statute.

*a. Legislative History.*  CALEA's legislative history shows that "ordinary reader[s] … around the time of the … statute's adoption," *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1293 (2025), understood Section 105 to apply to the lawful implementation of government-initiated intercept and access capabilities mandated by Section 103.  Both the House and Senate reports note that Section 105 "protects systems security and integrity" by "mak[ing] clear that *government agencies* do not have the authority to activate remotely interceptions within the switching premises of a telecommunications carrier."  H.R. Rep. No. 103-827, at 26; *see also* S. Rep. No. 103-402, at 25-26 (emphasis added).  On the House floor, Congressman Edward Markey explained that "Section 105" guards against "privacy" concerns created by Section 103's "wiretapping technology" by "requiring telephone company participation, which serves as a check against an end-run of *the judicial system*," a clear reference to the requirement for law enforcement to obtain a warrant or other lawful authorization.  140 Cong. Rec. H10781 (daily ed. Oct. 4, 1994) (emphasis

added). The bill's sponsor, Congressman Don Edwards, echoed that understanding, explaining that CALEA sought to "preserve the principle" from the Wiretap Act "that there must be a warrant by a court before there is any kind of listening in." *Id.* at H10782. So to "protect[]" "privacy" and "civil liberties," he explained, the bill imposed "tougher standards *for the FBI and the police* in going through any kind of wiretapping." *Ibid.* (emphasis added).

b. *Contemporaneous Agency Understanding.* The Commission's contemporaneous understanding of Section 105 matched congressional intent. *See Loper Bright*, 603 U.S. at 386 ("the longstanding practice of the government … can inform a court's determination of what the law is" (cleaned)). In 1999, the Commission echoed Congress's understanding that "section 105 of the Act was enacted to make clear that *government agencies* do not have the authority to activate remotely interceptions within the switching premises of a telecommunications carrier," 1999 CALEA Order ¶ 17 (quotations omitted) (emphasis added), and was not intended to "'micro-manage' telecommunications carriers' corporate policies," *id.* ¶ 18; *see also id.* ¶ 3 ("Congress recognized the need to protect privacy interests *within the context of court-authorized electronic surveillance*" (emphasis added)). The Commission thus imposed only narrow personnel and recordkeeping requirements that closely track the statutory text. *Id.* Appendix A.

*c. Statutory Purpose.* This straightforward reading of Section 105 "also comports with the purpose of" CALEA. *Texas v. EPA*, 132 F.4th 808, 836 (5th Cir. 2025). The title of the statute is the Communications Assistance *For Law Enforcement* Act. CALEA § 101 (emphasis added); *see United States v. Moore*, 71 F.4th 392, 397 (5th Cir. 2023) ("Titles, when written by Congress, can be a helpful tool for statutory interpretation."). And the codified statement of purpose notes that CALEA "make[s] clear a telecommunications carrier's duty to cooperate in the interception of communications *for law enforcement*." CALEA Preamble (emphasis added); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014) (analyzing "statement of the statute's purposes" codified in "the Act"). Both the title and statement of purpose demonstrate that CALEA is specifically concerned with interceptions and access *for law enforcement*. Thus, reading Section 105 to apply only to the law enforcement-initiated interceptions and access capabilities mandated by Section 103 "afford[s] proper respect to the prerogatives of Congress." *Fischer v. United States*, 603 U.S. 480, 497 (2024) (cleaned).

**B. The Order Misreads CALEA To Impose A General Cybersecurity Mandate Across Entire Communications Networks.**

The Commission's hastily issued and procedurally defective Order rejected the notion that Section 105 of CALEA is limited to providing communications assistance for law enforcement. Rather, under the Order's telling, Section 105 "independently obligates telecommunications carriers to prevent all incidents of

unauthorized interception of communications and access to call-identifying information, not merely those carried out by law enforcement." Order ¶ 13, AR1:9. In other words, Section 105 (per the Order) is not a narrow requirement to effectuate the law enforcement interception and access capabilities mandated by Section 103 but instead a broad and general cybersecurity mandate requiring providers to "ensure" absolute safety from all external threats and in all contexts across their entire networks. That reading of CALEA vastly exceeds the Commission's authority and is flatly inconsistent with the statutory text, structure, purpose, and context.

1. Text. The Commission purports to ground its interpretation of CALEA on "a plain reading of the statutory text." Order ¶ 12, AR1:8. It errs because it "construe[s]" a few isolated words "in a vacuum." *Contra Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1111.

a. *"Can be activated."* To begin, the Commission baldly asserts that Section 105's use of the phrase "*any* interception" is "without limitation." Order ¶ 13, AR1:9. But it reaches that conclusion only by ignoring the limitations Congress *did* place on that phrase. Congress followed it with the clause "can be activated." *See supra* section I.A.1.c. As explained, that phrasing is unique to Section 105 and otherwise absent from CALEA and the Wiretap Act. It shows that Section 105 covers interceptions that are "activated" using the government-initiated interception and access capabilities that must be enabled under Section 103. Indeed, the FCC's

35

reading would have slightly more, though still not controlling, force *without* this clause—for example, if Section 105 read: "A telecommunications carrier shall ensure that any interception … or access … effected within its switching premises ~~can be activated~~ is only in accordance with …." But that is not the statute Congress wrote. This new interpretation of Section 105 by the FCC would fail to "give independent legal effect to every word and clause in a statute." *United States v. Palomares*, 52 F.4th 640, 644 (5th Cir. 2022).

b. *"Within its switching premises."* The Commission fares no better trying to reconcile its unbounded reading of Section 105 with the "switching premises" limitation in its text. The Order's only mention of this clause is a parenthetical in a footnote claiming that a "'switching premises' includes 'routers, soft switches, and other equipment that may provide addressing and intelligence functions for packet-based communications to manage and direct the communications along to their intended destinations.'" Order ¶ 13 n.45, AR1:9. This essentially describes a "switching premises" as an entire modern communications network. *See* Carr Dissent at 1.

That is flatly inconsistent with Section 105's "single, best meaning … fixed at the time of enactment." *Loper Bright*, 603 U.S. at 400. At the time of enactment, both Congress and the Commission agreed that "switching premises" meant a provider's "central offices and mobile telephone switching offices." H.R. Rep. No.

103-827, at 26; 1997 CALEA NPRM ¶ 21 n.82.  That understanding is reflected in Section 105's focus on interception and access that occurs "*within* [a provider's] switching *premises*."  47 U.S.C. § 1004 (emphases added).  Both "within" and "premises" suggest a physical office, rather than—as the FCC urges—a series of routers and soft switches.  Congress easily could have used a broader term if it wanted to reach a provider's entire network.  CALEA expressly incorporated the Wiretap Act's definitions, *see id.* § 1001(1), and thus Congress could have applied Section 105 to the "electronic communications system"—an all-encompassing term that reaches virtually all "facilities" and "equipment" across a provider's network, 18 U.S.C. § 2510(14).  Congress also could have borrowed the broader scope from Section 103: a provider's "equipment, facilities, or services."  47 U.S.C. § 1002(a).  Congress did not use those broader terms, and interpreting the statute as if it did reads "switching premises" "out of the statute."  Carr Dissent at 1.

The Commission's erroneous interpretation of "switching premises" is based on nothing more than a misreading of its own precedent.  Its only citation for the broad interpretation is a 2019 FCC order, *see Protecting Against Nat'l Sec. Threats*, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd. 11423, ¶ 35 & n.105 (2019), which in turn cites a 2005 order, *see CALEA*, First Report and Order and Further Notice of Proposed Rulemaking, 20 FCC Rcd. 14989, ¶ 11 (2005).  But the 2005 order did not interpret the term "switching premises" in

Section 105.  Rather, it interpreted the term "*switching*" in Section 102's definition

of "telecommunications carrier."  *See id.* ¶¶ 10-11; *accord* 47 U.S.C. § 1001(8)(A).

But "switching" and "switching premises" are different terms that appear in different

provisions.  While "switching" might be read to encompass individual functions and

pieces of hardware—as might a term like "switching equipment," 47 U.S.C.

§ 1005—a "switching *premises*" contemplates a physical location "within" which

an "individual officer or employee" is "acting."  *See id.* § 1004; *accord Southwest*

*Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) ("Where a document has used one

term in one place, and a materially different term in another, the presumption is that

the different term denotes a different idea." (cleaned)).  Finally, this narrower

interpretation of the term dovetails with the FCC's own implementation of Section

103, which imposes the intercept and access capability at a distinct "intercept access

point."[5]

At bottom, the phrase "within its switching premises can be activated" only

makes sense if Section 105 is limited to the government-initiated interception and

access capabilities required by Section 103.  *See supra* section I.A.1.  The Order's

myopic focus on the phrase "any interception"—at the expense of all text that comes

---

[5] *See CALEA*, Order on Remand, 17 FCC Rcd. 6896, 6926-6927 ¶¶ 79-80, 6936 ¶ 108 (2002) (analyzing capabilities "reasonably available to the carrier" under section 103 and processed at carrier intercept access points); 47 C.F.R. §§ 1.20000, 1.20007 (defining "intercept access point" within the framework designed to "[i]mplement the assistance capability requirements of CALEA section 103").

before it (i.e., Section 103) and after it (i.e., "within its switching premises can be activated" and Section 107)—overlooks these crucial textual limits.

*c. "Shall ensure."* The Commission's other claimed pieces of textual support—the words "shall ensure" and the word "only," *see* Order ¶ 12, AR1:9— are incompatible with those limits. In the Commission's view, these words require implementation of "cybersecurity best practices" to "make[] it less likely that attackers can gain unauthorized access to networks." Order ¶ 14, AR1:10. But the Commission's interpretation demands much more than mere prophylactic measures. The word "'shall' is 'mandatory' and 'normally creates an obligation impervious to judicial discretion.'" *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (citing *United States v. Rodgers*, 461 U.S. 677, 706 (1983)). And the word "ensure" means "[t]o make *sure or certain*." *Ensure*, American Heritage Dictionary (3d ed. 1994) (emphasis added). Thus, if Section 105 means every provider "shall ensure" that "only" lawful interceptions occur, then even the most diligent and top-of-the-line cybersecurity measures would fall short if a sophisticated hacker managed to intercept a single communication.

The Commission is right to distance itself from the natural conclusion of its own reading. For one, the idea that Section 105 requires perfect security cannot be squared with Section 229's narrow requirements for regulations governing personnel and recordkeeping. *See* 47 U.S.C. § 229(b). Further, perfect security would have

been recognized as an impossibility in 1994.  It was already well-understood in that time period that cyber "security is *never* perfect when a system is implemented." National Institute of Standards and Technology, Special Publication 800-14, at 9 (1996) (emphasis in original), *available at* https://tinyurl.com/2vu67f8n.  There will inevitably be "new vulnerabilities" and "new ways to intentionally or unintentionally bypass or subvert security."  *Id.* at 9-10.  That is why when Congress *did* impose security obligations on communications providers in the mid-1990's, it spoke of a general "duty to protect."  *See* 47 U.S.C. § 222.  (And even there, the Commission has always understood the duty to require "reasonable measures," not perfection. *See* 47 C.F.R. § 64.2010(a).)

That the Commission is unwilling to stand by its own interpretation confirms its implausibility.  Once again, the much more natural reading is that Section 105 ensures the lawful activation of government-initiated intercepts and access required by Section 103.  Unlike the FCC's interpretation, this reading of Section 105 would not result in an implausible strict-liability regime because the Wiretap Act excepts from the definition of "intercept" provider and law enforcement acquisitions of communications when performed in the ordinary course.  *See* 18 U.S.C. § 2510(4) (defining intercept to require "electronic, mechanical, or other device"), 2510(5)(a)(ii) (defining "electronic, mechanical, or other device" to exclude equipment "being used by a provider of wire or electronic communication service in

the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties").

2. <u>Structure.</u>  CALEA's "statutory structure," like the text, compels a far more "targeted reading" of Section 105 than the universal cybersecurity mandate put forward by the Commission.  *Dubin v. United States*, 599 U.S. 110, 129 (2023).

*a. Private Standards.*  To begin, CALEA Sections 103(b) and 107 belie the notion that Section 105 authorizes the Commission to impose technical cybersecurity requirements.  Section 103 provides that CALEA "does not authorize any law enforcement agency or officer … to require any specific design of equipment, facilities, services, features, or system configurations to be adopted by any provider."  47 U.S.C. § 1002(b)(1)(A); *see also id.* § 1002(b)(1)(B) (similar disclaimer of authority to "prohibit the adoption of any equipment, facility, service, or feature").  Rather, Section 107 puts private bodies in the driver's seat in the first instance.  It provides a safe harbor for Section 103's capability requirements where providers are "in compliance with publicly available technical requirements or standards adopted by an industry association or standard-setting organization."  *Id.* § 1006(a)(2).  Only if these private organizations "fail to issue technical requirements or standards" or if "such requirements or standards are deficient" can the Commission issue its own "technical requirements or standards."  *Id.* § 1006(b).  And even then, the Commission must abide by limitations intended to protect

41

providers and their customers.  It must set standards that "minimize the cost of …

compliance," *id.* § 1006(b)(3), and "provide a reasonable time and conditions for

compliance," *id.* § 1006(b)(5).

The Commission's interpretation of Section 105 would drive a truck through

Congress's carefully devised scheme.  In the Commission's view, it can simply

declare that providers "take specific steps to secure their networks against

unauthorized interception."  Order ¶¶ 14-15, AR1:9-10.  But that would render moot

Section 107's authorization for the FCC "to establish, by rule, technical

requirements or standards that … protect the privacy and security of

communications not authorized to be intercepted" *only* by "petition" and *only* after

"standard-setting organizations fail to issue technical requirements or standards" or

if such "standards are deficient."  47 U.S.C. § 1006(b).  The Commission's

interpretation would also authorize a trivially easy end-run around Section 103(b)'s

prohibition on law enforcement agencies or officers requiring specific designs

because those agencies or officers could simply ask the FCC to do so for them.  This

Court should reject an interpretation that would render these key provisions "a

nullity."  *Ysleta Del Sur Pueblo*, 596 U.S. at 687.

*b. Enforcement Structure.*  CALEA's enforcement structure also fatally

undermines the Commission's interpretation.  Section 108 authorizes a "court" to

"issue an order enforcing [CALEA] under section 2522 of [the Wiretap Act] only if

the court finds that," *inter alia*, no other means are "reasonably available *to law enforcement* for implementing the interception of communications or access to call-identifying information."  47 U.S.C. § 1007(a)(1) (emphasis added).  The Wiretap Act, in turn, authorizes enforcement only where a court has "authoriz[ed] an interception" by law enforcement.  18 U.S.C. § 2522(a).  In other words, CALEA is enforceable in court *only* to facilitate interceptions by law enforcement.  That enforcement limit confirms CALEA's targeted focus on law enforcement interceptions and belies any notion Congress snuck a universal cybersecurity mandate into Section 105.

No other statutory provision can solve this enforcement gap.  The Commission generally brings enforcement actions under Section 503(b) of the Communications Act.  *See AT&T*, 135 F.4th at 233 (citing 47 U.S.C. § 503).  But that provision limits penalties to violations "of this chapter"—i.e., the Communications Act—and several other enumerated provisions not at issue here.  *See* 47 U.S.C. § 503(b)(1).  Section 105 of CALEA is not part of the Communications Act, nor is it listed in one of the enumerated provisions.  It is thus not enforceable under Section 503(b).

That non-enforceability was intentional.  Congress made parts of CALEA enforceable under Section 108.  And in Title III of CALEA, it added provisions to the Communications Act which accordingly fell within the purview of Section

503(b).  These provisions "show[] that Congress knows how to give the" FCC enforcement "authority" for violations of CALEA and did not do so here.  *Nat'l Auto. Dealers Ass'n ("NADA") v. FTC*, 127 F.4th 549, 558 (5th Cir. 2025).

Section 229 crystalizes this enforcement problem.  That provision gives the Commission authority to enforce violations of its CALEA-implementing rules and "a[ny] violation by an officer or employee of any policy or procedure adopted by a common carrier" to comply with the FCC's rules to implement Section 105.  47 U.S.C. § 229(d).  Thus, the Commission can enforce its own rules implementing Section 105, but it cannot enforce Section 105 itself.  This structure shows, at minimum, that the Order is unlawful in its declaration that providers have a "statutory obligation[] under section 105" to "adopt[] certain basic cybersecurity practices" "[e]ven absent rules adopted by the Commission."  Order ¶ 14, AR1:9-10.  And Congress's choice to not make Section 105 self-executing counsels strongly against reading into it a sweeping cybersecurity mandate.

This enforcement limit is no sudden revelation either.  In its first ever CALEA-implementing order, the FCC forthrightly recognized that, under "the plain language of the statute," it could not "extend criminal and/or civil liability, vicarious or otherwise, to a carrier for violations of section 105 of CALEA."  1999 CALEA Order ¶ 60.  "Instead," the Commission explained, "if a carrier violates the Commission's rules implementing section 105 of CALEA, the Commission shall

enforce, pursuant to section 229(d), the penalties articulated in section[] 503(b)." *Ibid.*

Petitioners' interpretation avoids this enforcement problem. Because Section 105 applies only to Section 103's government-initiated interception and access capabilities, the judicially enforceable requirement to abide by Section 103 is sufficient to ensure compliance with Section 105. *See* 47 U.S.C. § 1007(a)(1); *accord id.* § 1006(b)(2) (providing for compliance with Section 103 via "technical requirements or standards that … protect the privacy and security of communications not authorized to be intercepted").

*c. Section 229(b).* Section 229(b) fatally undermines the claim that Section 105 is a broad cybersecurity mandate. As explained, Section 229(b) instructs the Commission to promulgate two kinds of procedural rules "to implement section 105": (1) "appropriate policies and procedures for the supervision and control of" personnel, and (2) recordkeeping requirements. *See id.* § 229(b).

Section 229(b)'s narrow scope is inconsistent with the broad cybersecurity obligation the Commission reads into Section 105. It is a guiding interpretive principle "that statutory words are often known by the company they keep." *In re Crocker*, 941 F.3d 206, 219 (5th Cir. 2019). When interpreting a broad mandate and a specific list, courts construe the scope of the mandate by identifying the "common quality—the least common denominator, so to speak—relevant to" the specific list.

45

*Ibid.* Applied here, Section 229(b)'s specific commands—supervising employees and maintaining records—govern activities that occur when the provider is itself facilitating interceptions at its switching premises at the behest of law enforcement. Indeed, the only use of the term "secure" in Section 229(b) relates to the recordkeeping requirement of (b)(2). Thus, courts should construe the scope of Section 105's mandate as coextensive with these supervision and recordkeeping requirements—a far cry from the Order's prophylactic rules to prevent all third-party, non-government interceptions. *Crocker*, 941 F.3d at 219; *accord United States v. Taylor*, 596 U.S. 845, 856 (2022) (rejecting "government's competing interpretation" that would "vastly expand [a] statute's reach by sweeping in conduct that poses an abstract risk" unrelated to neighboring terms).

*d. Manufacturer Consultation and Cooperation Provisions.* CALEA section 106 requires providers to "consult" with their manufacturers to ensure "compl[iance] with the capability requirements of section [103] and the capacity requirements … under section [104]," 47 U.S.C. § 1005(a), and requires those manufacturers to "cooperate" with such provider compliance efforts, *id.* § 1005(b). These provisions would make little sense under the Commission's interpretation. Section 106 makes no mention of Section 105. And if Section 105 imposed an onerous cybersecurity mandate on providers, it would be passing strange for Congress to omit that

requirement from the mandatory manufacturer consultation and cooperation provisions specifically designed to facilitate providers' compliance with CALEA.

*e. Reimbursement Provisions.* Congress's reimbursement provisions also cannot be squared with the FCC's interpretation. Congress allocated $500 million, 47 U.S.C. § 1009, for the government to reimburse providers for upgrading their existing equipment to comply "with the assistance capability requirements of" Section 103, *id.* § 1008(a), (b)(2), and the "capacity requirement[s]" of Section 104, *id.* § 1003(e). This significant appropriation was no idle choice either. As CALEA's sponsor explained, "[t]he question of costs was very difficult." 140 Cong. Rec. at H10782 (statement of Rep. Don Edwards); *see ibid.* (statement of Rep. Mike Oxley) (referring to "the issue of cost" as an "area of controversy" that required "compromise"); *see also* H.R. Rep. No. 103-827, at 49-50. And the $500-million figure was estimated by the Government Accountability Office specifically to cover Section 103's capability requirements, H.R. Rep. No. 103-827, at 16. Congress's allocation of hundreds of millions of dollars to cover CALEA compliance makes little sense if Section 105 independently imposed a network-wide cybersecurity requirement without any consideration of how to shoulder that significant compliance burden.

3. <u>Purpose and Context</u>. CALEA's purpose and context also cut sharply against the FCC's interpretation.

*a. Legislative Context.* The legislative context of CALEA reveals that "the Government's interpretation" would result in a "breathtaking" scope and "far-reaching consequences" that "underscore[] [its] implausibility." *Van Buren v. United States*, 593 U.S. 374, 393-394 (2021).

In 1994, when CALEA was enacted, *millions* of miles of above-ground telephone wire and cable stretched across the United States, *see* FCC, Statistics of Communications Common Carriers, at 12-14 (1994/1995 ed.) (Table 2.2), *available at* https://tinyurl.com/yusjv9ew, all of which was theoretically "vulnerable to compromise" and connected to "switches," Order ¶ 14, AR1:10. While technological and industry developments were making it "more difficult" to intercept communications, it was still possible for someone to "effect [an] intercept … at locations in the 'local loop,' removed from the carrier's central office." 1997 FBI Comments at 2-3. In light of this fact, if the FCC's interpretation of Section 105 were correct, Congress would have—with a single oblique sentence and without any discussion in the legislative history—tasked every communications provider in the country with "ensuring" the cybersecurity of millions of miles of physical infrastructure. "Congress does not" typically "hide" such "elephants" in "mouseholes." *Serta Simmons Bedding*, 125 F.4th at 590. Indeed, when an agency, as here, "claim[s] to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority," courts require

clear evidence of Congress's intent to delegate authority over such major questions. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (cleaned). There is no such clear authorization here.

The implausibility of the Commission's sweeping approach is buttressed by the fact that Congress had already fashioned legislative solutions to prevent unauthorized interceptions. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) ("the 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others'"). Decades earlier, the Wiretap Act had outlawed the manufacture, distribution, possession, advertising, *and use* of interception devices. *See* 18 U.S.C. §§ 2511-13. And for interceptions that raised national-security issues, FISA had already empowered counterintelligence officials to address them. *See* 50 U.S.C. § 1805(g)(2). Because Congress had already acted in these ways to address unauthorized interceptions, it is unlikely Section 105 would have silently tasked providers with independently solving the issue themselves in a statute focused on an entirely different problem.

*b. Subsequent Cybersecurity Laws.* The Commission's interpretation of Section 105 also makes a mess of statutes that *do* address privacy and cybersecurity. For example, just two years after CALEA's enactment, Congress enacted Section 222 of the Communications Act to impose a "duty to protect the confidentiality" of "customer proprietary network information," or "CPNI." 47 U.S.C. § 222. The

definition of CPNI overlaps with CALEA's definition of "call-identifying information."  *Compare id.* § 1001(2) ("dialing or signaling information that identifies the origin, direction, destination, or termination" of a "communication"), *with id.* § 222(h)(1)(A) ("information that relates to the … destination [and] location … of use of a telecommunications service").  However, it would have made no sense for Congress to impose privacy and security protections on call-identifying information if—only two years earlier—it had already "ensure[d]" that such information could never be accessed by another party.

The Commission's interpretation of CALEA would also create tension with Section 222.  That is because the Commission's reading of Section 105 prohibits any "access to call-identifying information" in any context (not just law enforcement access) without a court order, while Section 222 *mandates* "disclos[ure]" of such information "upon affirmative written request by the customer, to any person designated by the customer."  47 U.S.C. § 222(c).  Thus, the Commission's interpretation would violate "th[e] Court's duty to interpret Congress's statutes as a harmonious whole rather than at war with one another."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018).

Further, Section 222 and other statutes show that Congress addresses network security by authorizing carefully-designed, risk-based plans or taking other targeted measures, rather than imposing absolute provider mandates to "ensure" security.  For

example, the Homeland Security Act—enacted just eight years after CALEA—mandated "a comprehensive national plan for securing the … critical infrastructure of the United States, including … information technology and communications systems (including satellites)." 6 U.S.C. § 652(e)(1)(E). But this comprehensive security plan, which came to support today's cooperative approach to cybersecurity, would have made little sense if Congress had already "ensure[d]" communications security in 1994. And in the Secure and Trusted Networks Act of 2019, Congress expressly directed the FCC to take certain circumscribed action to protect communications equipment from national security threats. *See generally* Pub. L. No. 116-124, 134 Stat. 158 (2020). That "Congress has enacted statutes that expressly" target the problem the FCC "asks [the Court] to read in" to CALEA confirms "that Congress chose a different path here." *NADA*, 127 F.4th at 558.

*c. Legislative Purpose.* Finally, it makes good sense to ground any interpretation of Section 105 in what CALEA was enacted to address: communications assistance for law enforcement. *See supra* Section I.A.3.c.

The Order rejects this understanding by misreading a single, unexplained change to Section 105 in the legislative drafting process. *See* Order ¶ 13, AR1:9. The Commission notes that a prior version of Section 105 required that a provider "shall ensure that any *court ordered or lawfully authorized* interception of communications or access to call-identifying information effected within its

51

switching premises can be activated only with the affirmative intervention of an individual officer or employee of the carrier." S. 2375, 103d Cong. § 2604 (1994). In the Commission's telling, by removing the italicized language from the final text of Section 105, 47 U.S.C. § 1004, "Congress required carriers' facilities to be secure against all unlawful interception," Order ¶ 13, AR1:9.

The Commission is wrong. The explanation for the change better supported by CALEA's text, purpose, and context is that it established guardrails for the lawful activation of interception and access requests by requiring providers to ensure that (1) there is in fact a court order or other lawful authorization, and (2) the requested interception is "in accord[]" with that authorization. In other words, the previous version presumed lawful authorization as a given while the amended version required providers to ensure it. Indeed, that is exactly how the Commission interpreted this language after the enactment of CALEA. It explained in its 1999 implementing order that "to satisfy section[] 105 … a carrier must, upon receipt of a proffered authorization by law enforcement, *determine if such authorization is what it purports to be*" and "*review the court order/certification in order to act within its stated scope.*" 1999 CALEA Order ¶ 34 (emphases added). Thus, this amendment affirmatively supports Petitioners' reading by confirming that providers' Section 105 obligations are aimed at law enforcement interceptions and access.

## II.    THE COMMISSION FAILED TO COMPLY WITH PROCEDURES MANDATED BY CALEA AND THE APA.

The Order's fundamental interpretive flaws were likely driven by another flaw: the FCC's failure to abide by the procedures required by both CALEA and the APA. That procedural misstep is an independent reason to set aside the Order.

*First*, the FCC failed to heed Section 107(b) of CALEA. That provision, entitled "Commission authority," authorizes the Commission to "establish, by rule, technical requirements or standards that," *inter alia*, "protect the privacy and security of communications not authorized to be intercepted." 47 U.S.C. § 1006(b)(2). But the Commission can do so only "[i]f industry associations or standard-setting organizations fail to issue technical requirements or standards" or if it receives a "petition" alleging that "such requirements or standards are deficient." *Id.* § 1006(b). And, in setting such requirements, the Commission must be cognizant of costs and other compliance burdens. *Id.* § 1006(b)(3)-(5).

The Order did not abide by Section 107(b). Instead, it simply declares that providers must undertake "[e]nterprise-level implementation of … basic cybersecurity hygiene practices" in order "to prevent unlawful real-time access to communications." Order ¶ 14, AR1:9-10. It lists as "example[s]" "role-based access controls, changing default passwords, requiring minimum password strength, and adopting multifactor authentication," as well as "patch[ing] known vulnerabilities" and responding to "identified exploits." *Ibid.* But these types of

53

requirements would fall under Section 107(b) because they are plainly designed to "protect the privacy and security of communications not authorized to be intercepted," and then only if they met the relevant statutory criteria. 47 U.S.C. § 1006(b)(2). Because the Commission did not find existing technical standards absent or deficient and did not purport to consider costs and other compliance burdens, the Order did not adhere to the statutory procedures.

Section 229(a)'s grant of general rulemaking authority does not remedy this violation. That provision gives the Commission authority to "prescribe rules as are necessary to implement the requirements of" CALEA. *Id.* § 229(a). However, "it is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Thus, the Commission cannot rely on Section 229's general grant of rulemaking authority to render "superflu[ous]" Section 107(b)'s specific grant of more limited authority to promulgate technical requirements or standards to protect privacy and security. *See ibid.* And as noted above, Section 229 separately accounts for the types of rules Congress expected the Commission to adopt to implement Section 105, and mentions only the supervision and recordkeeping requirements necessary to support the Section 103 capability mandate. *See* 47 U.S.C. § 229(b).

*Second*, whether promulgated under Section 107(b) or Section 229(a), the Commission was required to undertake APA notice-and-comment rulemaking. Both

54

provisions of CALEA instruct the Commission to act by rulemaking. *See* 47 U.S.C. §§ 1006 ("establish, by rule"), 229(a) ("prescribe such rules"). And when "formulating … a rule," 5 U.S.C. § 551(5), the APA requires "[g]eneral notice of proposed rule making," *id.* § 553(b), and "an opportunity to participate," *id.* § 553(c). Because the Commission provided neither notice nor an opportunity to comment before issuing the Order, it ran afoul of these requirements.

The Order invoked no exception to notice-and-comment rulemaking, and none applies. Indeed, the Order is neither an "interpretative rule[]" nor a "general statement[] of policy." 5 U.S.C. § 553(b)(A). It instead "speak[s] with the force of law," *Mock v. Garland*, 75 F.4th 563, 580 (5th Cir. 2023), by unambiguously declaring for the first time "that section 105 of CALEA affirmatively requires [providers] to secure their networks from unlawful access to or interception of communications," Order ¶ 11, AR1:8. And it dictates that the "basic cybersecurity hygiene practices" discussed above "are necessary for any sensitive computer system." *Id.* ¶ 14, AR1:9-10. The Order thus "reads like a ukase." *Mock*, 75 F.4th at 582. "It commands, it requires, it orders, it dictates." *Ibid.* The result will be the kind of "significant effect[] on private interests" that is indicative of a legislative rule. *Id.* at 580. Further, the Order did not assert any "good cause" that would have made notice and comment "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

The Commission's failure to abide by CALEA and APA mandated procedures independently require vacatur of the Order.  *See Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th at 815; *accord NRDC v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (explaining that "failure to provide the required notice and to invite public comment … is a fundamental flaw that normally requires vacatur of the rule" (cleaned)).

## III.  THE COMMISSION'S ORDER IS ARBITRARY AND CAPRICIOUS.

The Order is also independently unlawful because it is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).  "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio*, 603 U.S. at 292.  The Order falls short of these standards in at least three ways.

*First*, the Commission failed to explain the standard of care imposed by its new cybersecurity mandate.  Agency action is arbitrary where it "fails to provide comprehensible guidance about what falls within the bounds" of its regulations.  *Hikvision*, 97 F.4th at 950; *accord Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 894 (5th Cir. 2024) ("while companies are required to stay apprised of laws and regulations, they are not required to predict an agency's actions with extraordinary intuition or with the aid of a psychic" (cleaned)).  The Order is arbitrarily vague because it baldly asserts that providers must "take action to prevent" unauthorized interceptions, Order ¶ 13, AR1:9, without providing a guiding principle or cognizable standard for such action.  Unlike the Commission's longstanding

reasonableness standard to secure customer information under Section 222, *see, e.g.*, 47 C.F.R. § 64.2010(a) ("reasonable measures"), the sum total of the Commission's guidance here is *do something*. The Order is thus "unworkable," *Hikvision*, 97 F.4th at 950, and "'offers no meaningful guidance' to affected parties," *ACA International v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018).

*Second*, the Commission arbitrarily, and seemingly at random, mandates a handful of "example[s]." Order ¶ 14, AR1:9-10. It claims that providers need to employ "role-based access controls" and "best practices that are known to be necessary in response to identified exploits." *Ibid.* But why these practices and not others? Although the Commission cites nonbinding guidance documents from CISA and the Center for Internet Security, those documents contain a wide variety of different cybersecurity practices—not just the examples mentioned in the Order. Further, the Commission fails to explain why it chose examples from those documents and not other foundational cybersecurity guidelines, such as the NIST Cybersecurity Framework. *See* NIST, Cybersecurity Framework 2.0 (Feb. 26, 2024), *available at* https://tinyurl.com/2253c4zy. Thus, the Order is arbitrary because the Commission did not "articulate[] a rational connection between the facts found and the decision made." *Louisiana v. DOE*, 90 F.4th 461, 469 (5th Cir. 2024).

The Commission's non-exhaustive list of mandates also raises important issues that the agency entirely overlooks. For example, the Commission mentions

the need to "patch known vulnerabilities," Order ¶ 14, AR 1:9-10, but it makes no mention of how quickly patches should be deployed. It mentions "multifactor authentication," *ibid.*, but it does not discuss which kinds of multifactor authentication are sufficient (e.g., text messages or a third-party service). It requires "minimum password strength," *ibid.*, but offers no guidance on what strength is sufficient. It mentions risks from "third-party vendors," *ibid.*, but offers nothing about how to assess and mitigate risks across a complex telecommunications supply chain. And these are just the issues presented by the cybersecurity practices the Commission identified, to say nothing of those with which it might expect compliance but did not mention. The Order is thus arbitrary because the FCC "ignored … important aspect[s] of the problem before it." *Ohio*, 603 U.S. at 294 (cleaned).

*Third*, the Commission failed to "consider … the costs and benefits associated with the regulation." *Chamber of Com.*, 85 F.4th at 777 (cleaned); *see also Michigan v. EPA*, 576 U.S. 743, 752 (2015). Here, despite its sudden declaration that a thirty-year-old statute imposes an unprecedented and standardless cybersecurity mandate on every telecommunications carrier in the country, the Commission does not spend a single word of the Order considering whether the "benefits" of its new approach (or any of the specific choices made) "bear a rational relationship to the costs." *Chamber of Com.*, 85 F.4th at 777 (cleaned). That alone renders the Order arbitrary.

## CONCLUSION

In light of the foregoing, this Court should grant the petition and vacate the

Order.

Dated: June 9, 2025

Respectfully submitted,

*/s/ Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.
  *Counsel of Record*
Megan L. Brown
Joshua S. Turner
Kathleen E. Scott
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I certify that on June 9, 2025, I caused the foregoing to be served upon all counsel of record via the Clerk of Court's CM/ECF notification system.

Dated: June 9, 2025

*/s/ Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 12,996 words.

This brief also complies with the typeface and type style requirements of Fifth Circuit Rule 32.1 and Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 365 in Times New Roman and 14-point font.

Dated: June 9, 2025                    */s/ Thomas M. Johnson, Jr.*
                                       Thomas M. Johnson, Jr.